# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Shaun McGough, | ) | |
|             Plaintiff, | ) | |
| | ) | ____ CV_____ |
|    -against- | ) | |
| | ) | COMPLAINT |
| Elastic NV, Rachele Igoe, Erika Haraguchi, | ) | |
| and Does 1 - X | ) | |
| | ) | |
|          Defendants. | ) | |
| _____ | ) | |

## OVERVIEW OF CASE, JURISDICTION, AND VENUE

1. The Mitchell Law Group, PC, whose business address is 295 Madison Avenue 12th Floor New York City NY 10017, j.mitchell@mitlawgrp.com, hereby files this Complaint with the United States District Court for the Southern District of New York, on behalf of PLAINTIFF SHAUN MCGOUGH (SM), alleging violations of SM's rights under two U.S. Statutes identified below, which were committed by one or more of the Defendants, specifically, SM's employer, Elastic NV (the Company) during all relevant times, by Company employees Rachelle Igoe and Erika Haraguchi, and by unnamed individual Company employees denominated Does 1 - X because their identities and specific activities are presently unknown.

2. This action challenges, under the Fair Labor Standards Act, 29 USC Sections 201 et seq. (FLSA) and the Family and Medical Leave Act, 29 USC Sections 2601 et seq. (FMLA), the Company's improper withholding of estimated amounts from the compensation of SM, a salaried exempt employee of the Company, on at least four separate occasions on the grounds that SM was not performing any work for the employer because he was properly on FMLA leave.  However, this position is fatally flawed by the fact that SM was never properly on FMLA leave. Moreover, we believe that both the employer's reliance on FMLA to justify the withholding of salary, and the resulting withholding of salary, were willful violations of both FMLA and the FLSA that justify the application of a three-year statute of limitations for this filing and action.  Finally, we hold that the Company's inexplicable adverse changes in SM's duties upon his return to work following the end of the FMLA leave constituted another independent of violation of

FMLA, and that this demotion and one, several, or all of the compensation deductions were acts of retaliation against SM for his months-long complaints and criticisms of the Company's conduct in all of these actions that he relentlessly lodged with them.

3.  This Court has jurisdiction pursuant to Article III Section 2 of the United States Constitution and 29 USC Section 1331.  Venue is proper in this District under 29 USC Section 1391(b)(2), (b)(3), (c), and/or (d) because the events and omissions relevant to this action occurred in this District and the Defendant employer is subject to personal jurisdiction in the State of New York.  The relevant actions all occurred within two and certainly within three years of this filing.  Specifically, SM was informed on 10 November 2020 for the first time that he would be placed on FMLA leave beginning the next day, 11 November 2020; the improperly reduced payments were made to him on 15 December 2020, 15 and 29 January 2021, and 12 February 2021; and the demotion in his work duties began upon his return to work after FMLA leave beginning 3 February 2021.

## **<u>FACTS</u>**

<u>SM's Work for Elastic</u>

4.  At all times relevant to this action, Elastic NV created, developed, supplied, updated, and serviced various kinds of computer programs and software for use in a variety of industries and applications. On information and belief, the Company's headquarters and/or base of operations is in California, but throughout the period applicable to this Complaint the Company has maintained an office in New York City that is the primary locus of operations and supervision for many dozens of Company employees in the geographic New York region.

5.  SM began working for Elastic in February, 2019, and continues to be employed there. His physical workspace during relevant times was in the Company's New York City office located at 45 W 27th St, Floor 5, New York, NY 10001, but he frequently worked remotely from his own residences in, initially, Manhattan and, later, in New Jersey. Initially, SM's direct supervisor was Mr. Steve Kearns, but ultimately SM's co-supervisors for times relevant to this Complaint were two other Company employees, Vijay Doshi and Alona Nadler, based out of the Seattle area and Silicon Valley, respectively. When the Covid19 pandemic lockdown began in New York City in March, 2020, SM began working exclusively from his residence, as did many, if not all, of the Company's NYC employees, but he video-conferenced with his supervisors and fellow employees on a routine basis. At all times pertinent to this Complaint, from the beginning of his employment, throughout the pandemic lockdown during which the New York City

office was essentially closed, that both SM and Elastic considered the location of the Company's office on W 27th Street to be his Company base.

6. The ergonomics of SM's work for Elastic, the physical manner in which he performed his duties, have varied over time. Before the pandemic lockdown, SM would occasionally physically be in the Company's New York City office during most or all of standard business hours, Mondays through Fridays, and occasionally went into the office on weekends. But he also worked on his projects outside of standard office hours, often working before 9 am or after 6 pm Mondays through Fridays, and also during various hours on weekends, both in and outside the office. After lockdown began, he worked exclusively outside of the office, typically during standard office hours Mondays through Fridays but also outside of these hours and on weekends as he had before. The total number of hours that SM worked on Company projects every week varied, but both before and after lockdown began this number routinely exceeded 70 hours per week, and SM worked as many hours and on whatever schedule as was necessary to ensure the timely fulfillment of his commitments. In December 2020, for personal monetary reasons related to his being placed on leave, but unrelated to his medical condition, SM relocated to Wood-Ridge, a city in New Jersey, a short commute From New York City, but he continued working for the Company remotely, continued to consider the New York City office his home base, and continued reporting to Vijay and Alona as his supervisors, all as he had been doing before his move.  Well after the events discussed in this Complaint, SM relocated to Houston, Texas, where he still works for the Company reporting to an office in the area as his home base.

7. SM's formal title as a Company employee was at all relevant times and continues to be Principal Product Manager. Although his particular activities varied from day-to-day, his overall duties consisted of participating in the creation and development of the Company's computer products. This work was usually accomplished by several individuals working as teams that comprised different combinations of employees. Over the course of his employment, SM worked on several different product teams that focused on different Company products or services, and he frequently worked on several teams simultaneously, sometimes in a role that was viewed as a "team lead." Over the course of his employment, SM's success in performing his duties was recognized in several distinct ways that included increased team responsibilities, inclusion on a larger number of teams, two stock grants, a letter of commendation, two raises, and several performance reviews that were overwhelmingly favorable overall.

8. At all times relevant to this Complaint, the Company was an "employer" within the meaning of 29 USC 203 for FLSA purposes because, on information and belief, it is an enterprise engaged in interstate commerce and has employees engaged in interstate

commerce, meaning that it seems reasonable to believe that the Company does not acquire raw materials from or make product sales or shipments to only those states in which it operates; and it's volume of business done equals or exceeds $500K annually.

9.  At all times relevant to this Complaint, SM earned an annual salary that in gross exceeded $107,432, and was thus a Highly Compensated Employee within the meaning of the FLSA.  See 29 CFR 541.601(a)(1).

10. At all times relevant to this Complaint, SM was paid two times a month, typically on or around the middle of the month and again on or near the last day of the month, in an amount each time that represented 1/24th of his annualized salary, regardless of the quality of his work or the number of hours he had worked during the approximately two weeks of each payment period.

11. For all of the foregoing reasons, SM was a salaried, exempt employee within the meaning of the FLSA because of the nature of his work, the amount of his yearly gross salary, his duties, and the fact that he was paid the same amount every pay period regardless of how many hours he had worked during that period and of the perceived quality of his work in the period.  See, e.g., 29 USC 213(a)(1), (17) (types of exempt employees, including professionals, and computer workers and software designers); 29 CFR 541.602(a)(1) (exemption for salary-compensated employees).

SM's Illness

12. In late 2019, SM was diagnosed with Myelofibrosis, a rare blood cancer, and began receiving ongoing care from a team of healthcare providers that included an oncologist and others based at Weill Cornell New York Presbyterian on East 68th Street & York in Manhattan). There is currently no known cure for this cancer. It typically worsens as the patient ages and at some point is fatal, although it does not necessarily worsen in the same predictable pace or stages as some other kinds of cancers. There are currently no known treatments that reliably prevent the cancer from worsening, although many biochemists, academic and clinical physicians, and pharmaceutical companies are actively working on understanding, ameliorating or at least preventing the worsening of, and curing the disease. During the relevant times of this Complaint, treatment for the condition largely consisted of activities that were more accurately describable as acts of monitoring, consisting of the analysis of the patient's blood chemistry at regular intervals to determine whether and in what ways the condition is progressing.

13. In SM's case, this monitoring occurred approximately every three to six weeks, which was always on his calendar viewable to all employees of Elastic. It entailed spending

about two to four continuous hours at the Manhattan hospital where several of his treatment team members practice. It consisted of his team members drawing blood samples, doing bone marrow biopsies, MRIs, and EKGs, and assessing the condition's indicators while SM was fully conscious.

14. Of critical importance, neither SM's condition itself nor SM's treatments for it have ever interfered with the performance of his Company duties. In fact, SM frequently worked on Company projects during the monitoring sessions, and he worked sufficient time to compensate for any unavoidable downtime during his monitoring sessions to ensure that the sessions did not interfere with his work commitments, both of which meant and mean that as a practical matter his treatments no more impaired his performance than taking a long lunch break or visiting a museum or watching a film on a workday afternoon would have. Inversely, there has never been any evidence, nor have any of his healthcare providers told SM, that his work for the Company in any way exacerbated his condition, impeded his ability to heal from it, or exposed his colleagues to the risk of acquiring his condition. Thus, SM's medical condition has never impaired or negatively impacted SM's work for the Company, with the possible exception of the small portions of times during his monitoring sessions when he was literally unable to work and for which he compensated in order to prevent their adverse impact on his performance.

15. Relatedly, the treatability of this condition, its modulation or cure, were at the time and continue to be functions of the unique scientific and medical considerations that make it what it is, and of the point to which the healing powers of our medical expertise have evolved. If SM devoted every minute of every day of his life to this illness, to understanding it, monitoring it, tailoring activities to or for it, these efforts would be only as successful as the science and our medicine allow, not because he had or had not trained his attention on it obsessively or exclusively, or altered anything about his conduct because of it.

16. In November, 2019 during a phone call with his old supervisor, Steve Kearns, SM told Kearns that he had cancer. Steve suggested that SM tell Vijay Doshi, one of SM's new bosses. SM mentioned that he might do that. Steve also mentioned that if SM wanted, SM could tell Human Resources, and SM said he would think more about that. To SM's knowledge, Kearns never informed HR about any aspect of his condition.

17. Also in November, 2019, while SM and his supervisor Vijay were attending an off-site work-related conference, SM informed Vijay that he had cancer. At no point then or later did SM inform Vijay that he wanted or needed, either currently, or to his knowledge would want or need at any point in the future, any time away from work, whether paid or unpaid, continuous or intermittent, because of any problems caused by the condition, or

in order to receive treatments for it. SM believes that he remembers telling Vijay that he was disclosing this information to him confidentially and that he did not authorize him to convey it to any other person, and he was disappointed and upset when Vijay later told him on 21 February 2020 that he had told Human Resources that SM had cancer, although Mr. Doshi did not tell SM to whom or the date on which his disclosure to HR had occurred. Given the condition's asymptomatic and extremely low-impact nature at this point, it is unlikely that anyone at the Company would have known that SM even had it had he never initially disclosed it to Vijay. After the conference ended, SM continued his high-quality work for the Company, and neither the condition nor the treatments that he received for it in any way interfered with, impaired, devalued, or prevented his performance of this work. SM routinely posted his monitoring appointments with his doctors on his electronic work calendar, which was publicly visible within the Company.

18. At some point in the Spring or Summer of 2020, SM became interested in learning more about potentially transferring his medical "treatment" to MD Anderson Cancer Center in Houston, TX. One possibility would be that he would relocate to the Houston area for a stem cell /bone marrow transplant. As part of the process of exploring this possibility, Vijay told SM that his compensation might be impacted by this move to the Houston area because of its lower cost-of-living compared to the New York area, and told SM that he needed to direct this question to someone in HR, which SM did shortly thereafter via internal messaging system Slack around early November, 2020. SM simply wanted to know what the compensation change would be. His query was then directed to a "Compensation Committee." As before, when SM made this inquiry to both Vijay and Alona, he did not mention any intention, need, or desire to take a leave of any kind or length to address his condition at any point in time, either currently or at any future juncture. He was simply asking questions to get information that he believed could help him think through his universe of possible treatment options.

SM's Involuntarily Imposed FMLA Leave

19. SM never received any written or oral reply to this inquiry. However, on the evening of 10 November 2020, after SM had finished his work for the day, he joined a video conference call with Rachelle Igoe of Elastic HR and his two supervisors, Ms. Nadler and Ms. Doshi, believing that he would at last receive an answer about his compensation question. Instead, several other enormously significant pieces of information were conveyed to SM in this conference. First, Rachelle Igoe informed SM that effectively immediately he was being placed on full-time FMLA medical leave for an anticipated 12-week period so that he could "focus on his health", a phrase that she repeated later in the conference. Also, Ms. Igoe told SM that this decision to unilaterally place him on unpaid FMLA had been made in part for a cluster of three inter-related reasons that were

not explicitly linked to SM's health. These were the Company's judgments that at some point in the past that was identified only as being "recently" but was later clarified to be over the previous 2-3 months, SM had "made some decisions that were not in alignment with the Company's values or plans"; that these "decisions" were negatively impacting the work of more than one of the teams that SM was a part of; and that time away from work was necessary so that these decisions could be "insulated" and SM's "reputation" at work could be "repaired." Also, it was either in this conference call or in one or more of the subsequent conversations between only SM and Ms. Igoe that Ms. Igoe stated that the decision to place SM on FMLA leave was made by herself and her fellow Elastic employee Erika Haraguchi, Program Manager, U.S. Benefits, once these "damaging recent decisions" by SM came to their attention, without specifying whether any other Elastic employees were involved in or ratified this decision. In addition, SM was informed in this conference call of 10 November that someone would be contacting him soon to explain the process by which he could receive NY State funded "short term disability payments" that would provide him with some pre-determined portion of his normal Elastic salary while he was out on unpaid FMLA leave. That same day, after this conference call, Ms. Igoe sent SM an email message in which she reiterated points in the conference by saying  "our first priority is ensuring that you have the Space, Time (sic) to focus on your health without the added pressure of your job."

20. Every aspect of this completely unexpected conversation and subsequent email was shocking to SM, and deeply unsettled him, to wit: Being unilaterally placed on FMLA leave even though he had _never_ requested it, nor expressed to anyone at the Company any interest in or intention of taking leave under FMLA or under any other auspice. The fact that, as of the time of the announcement, the leave would be unpaid (ultimately, the Company did pay SM some or all of his regular salary, as detailed below). The fact that he was being placed on "medical leave" even though his medical condition had never interfered with his work. The fact that his performance reviews had been favorable overall, as corroborated by his increased responsibilities and team memberships and his bonus and the letter of commendation that accompanied the bonus. The idea that some unspecified "decisions" that he had made "recently" were apparently deeply transgressive of some unnamed Company "values." The Company's judgment that these "decisions" had adversely impacted his work and the work of other teams to the extent that his "reputation" needed to be "repaired." The Company's judgment that his absence from work was somehow necessary for this repair to occur. The fact that he would apparently need to apply and qualify for New York's "short-term disability" program, even though his medical condition had not disrupted his work performance, in order to continue receiving some fraction of his regular monthly income, a prospect that was independently upsetting to SM because he believed that he would have to perjure himself (i.e., by representing under oath that he was "disabled" when his work had not been negatively

impacted by his blood cancer) in order to qualify for these short-term benefit payments. (In the Relief Requested/Compensatory Damages section of this Complaint infra, SM catalogs the deleterious impacts that the suspension and Elastic's various justifications for it have had on his emotional, psychological, and physical well-being.) And all of this was against the backdrop that in the time between SM's initial disclosure of his condition to Vijay in November 2019, and this fateful video conference with Vijay, Alona, and Rachelle Igoe on 10 November 2020, approximately one year later, the Company had never made a single effort to learn more about SM's condition or its actual or potential current or future impact on his work performance, by initiating any kind of discussion with SM or his healthcare providers about it. Had a Company representative done so, among the things the Company would have learned were that some of SM's medical tests during 2020 had indicated slight improvements in his condition; that he had no definite plans to relocate to the Houston area at any specific time in the future; and that, given the current status of the relevant medical science, having medical leave time away from work would not necessarily result in SM "focusing" on his condition any more than he was already doing. The parties might also have discussed intermittent FMLA leave as a possible solution to whatever concerns the Company might have about SM's treatments. Additionally, such conversations with Company representatives would likely have allowed SM and the Company to discuss and ameliorate whatever non-medical factors the Company was having issues with about SM's performance that ultimately played a role in the Company's decision to place SM on involuntary FMLA leave.

Oral and Written Correspondence About the FMLA Leave

21. A few days after this conference, on Friday, 13 November 2020, SM sent Ms. Igoe and Erika Haraguchi, an Elastic employee who focused on employee benefit issues, a clearly and strongly worded email message in which, inter alia, he unambiguously abjured NY State short term disability payments, stated that he had not requested and did not want or need to be out on FMLA or any other kind of leave related to his medical condition, and requested that his FMLA leave status be reversed, all for the same reason: the simple fact that he was not "disabled" by his medical condition in any sense that it prevented him from performing his work for the Company. Among the reasons that SM did not want to receive benefits from the State STD program was his concern that he would have to commit perjury in order to receive them, i.e., by having to make a sworn statement saying in effect that his medical condition made him unable to perform his job, **which absolutely was not true.** He followed this message up with a similarly-worded one on 18 November. These email messages speak for themselves, and both of them are attached hereto as Exhibit A.

22. Over the next several weeks, SM and Ms. Igoe exchanged several emails and had several telephone conversations about SM's leave. After a cursory review of the Regulations interpreting the FMLA promulgated by the U.S. Department of Labor (the "Regs") in which the DOL encouraged workers and employers to engage in substantive dialogue about leave issues under this statute, SM both initiated email messages setting forth his concerns about the leave and did so in response to statements Ms. Igoe made. The most revelatory of the messages between SM and Respondents are included as Exhibits here. While the messages speak for themselves, several themes clearly dominate or at least recur in this correspondence. These include SM's unhappiness about being placed on FMLA leave, consisting of unhappiness because the leave was unpaid, because he had not requested it, and because he believed that his medical condition did not warrant it; his confusion about what were the other, non-medical reasons that, according to Ms. Igoe, had damaged his "reputation" and harmed his and others' work and necessitated his being placed on FMLA leave and his attempts to ascertain what these reasons were; his demand that he be taken off of leave and returned to the workforce immediately; the fact that the entire matter was causing him a great deal of undue anxiety and stress; and, increasingly, his allegation that the Company's placing him on leave and maintaining the leave were unlawful in one or more ways.

23. Correspondence and conversations reflecting SM's complete bewilderment about the non-medical reasons for the leave, his efforts to identify and understand them, and the Company's deflection of this topic, acting through Ms. Igoe, merit particular attention. At some point during one of his oral conversations with Ms. Igoe, one that occurred on 17 December 2020 that included Ms. Igoe, Ms. Haraguchi, and two people SM had, with Elastic's permission, invited, Ms. Igoe spontaneously volunteered to get more detail about these grounds (a curious construction all by itself, suggesting as it does that she herself had not theretofore been privy to these grounds, even though she was an apparently high-level Elastic HR representative (according to the Company's website, her current title is Operations Senior Director, Global Human Resources) and presumably would thus have at least been briefed about, if not involved in the formulation, rejection, or approval of, such consequential justifications). Repeatedly during what SM remembers as being around a 20 minute conversation, give or take a few minutes, Ms. Igoe said numerous times, echoing her statements on 10 November, that the reason SM was out on medical leave was because SM had "recently made decisions" during the previous 2-3 months that were described by Ms. Igoe as being "in conflict with the Company's strategy and work" or "not aligning" with the Company's "values" or "scale" that had raised questions about his work that required his work to be "checked and re- checked" or that were not "matching up" with "expectations" about his "obligations."

24. Because these explanations repeatedly sounded like criticisms of his performance, SM remembers at one point asking Ms. Igoe how he could be placed on leave for performance reasons when "99%" of his work reviews had been favorable, his team management and design work had been expanded to four teams from one team, he had been managing more projects, he had become an active member of the Accessibility Working Group, etc? Ms. Igoe's response was to explicitly say that his being placed on leave was not because of "direct performance issues" as if he was being placed on a performance improvement plan, but because of these mysterious "decisions" he had made. (Of course, Ms. Igoe's insinuation that the leave was not performance-related simply because SM had not been placed on a formal performance improvement plan or been subjected to some other formal mechanism intended to improve his work was a classic instance of verbal legerdemain. We take the common-sense, straightforward position that any work that an employee does in the course of and for the purpose of satisfying the duties for which he is being compensated constitutes his "work performance" and that any adverse consequences imposed on him for deficiencies in these activities -- such as unilateral suspension from work without any warning -- is directly "performance based", regardless whether formal disciplinary protocols and labels are involved or not.) At one point in this conversation after this particular exchange, SM remembers asking whether the Company thought that these decisions, whatever they were, were being caused by his cancer. Ms. Igoe emphatically said "no." When SM immediately followed this reply with the direct question, "then why am I on FMLA leave?", Ms. Igoe in response returned to her mantra that SM had "made decisions" that "raised questions" about his "alignment with Company values" and that Ms. Igoe and Ms. Haraguchi had "made the decision" to put SM on medical FMLA leave in order to "insulate these decisions" that SM had allegedly "made" -- clearly confirming by implication, despite Ms. Igoe's denial, that the Company did in fact believe that there was some connection between SM's health condition and his bad "decisions" and thus that the Company's perceptions, opinions, and judgments about these health conditions were at least indirectly responsible for the leave.

25. On 4 January 2021, SM followed up on Ms. Igoe's proffered commitment during the call of 17 December to get more information by sending her a lengthy email message in which he asked 14 specific questions not just about these assertedly non-medical reasons, but, again, about all of the reasons he had been put on leave. This message is set forth as Exhibit B. Both the brevity of and the basis for Ms. Igoe's peremptory dismissal of the inquiries in her emailed response of 11 January are breathtaking. She not only failed to make even the most superficial, perfunctory attempt to answer even one of the questions, but rebuffs all of them collectively because in her judgment the reasons weren't relevant to getting him back to work. (Her exact statement was "I understand that you don't agree with our decision to place you on leave, but continuing to come back to the reason why

we made the decision is not going to help with a path forward." See Exhibit B.) Of course, returning SM to his duties as quickly as possible was undoubtedly a vital and worthy goal. But summarily retracting, without any explanation, her own volunteered commitment to getting information for SM about why he had been placed on leave, apparently giving no consideration to the importance of this information to him, was cavalier and capricious.

26. One direct consequence of this refusal to provide information is that to this day, SM does not know not only the specific allegedly medically-related reasons that the Company relied on to put him out on FMLA leave, but also has no credible idea what the asserted non-medical grounds were.[1] It is difficult to gaze upon or grasp the multiple grotesqueries of this situation. It would have been bad enough that SM was forced to exhaust all of his federally-allotted leave time so that, erroneously, he could be "free" to undertake treatments that he was already optimally utilizing based on the applicable science, which created undue anxiety about what leave time would be available for him under FMLA if he actually needed it in the future; to be burdened by the prospect (and ultimately the occurrence) of income disruption during the leave and to have to consider perjuring himself in order to avoid income disruption, thereby having anxiety about money thrust upon him despite the facts that his cancer had not prevented him from working and to his knowledge his performance had been qualitatively well-regarded in spite of his medical condition. All of this was burdensome and anxiety-provoking by itself. But in addition to all of it, being placed on leave because he had allegedly unwittingly made certain "decisions" that were apparently so horrific that they had damaged his work and that of his colleagues, had damaged his reputation so badly that he had to be separated from work so that it could be "repaired", and had deeply offended company values, yet not to be told what these decisions were, exactly what made them so terrible and what caused them to be so destructive, to not be told why separation from work for exactly 12 weeks would apparently be the only curative for them, or told exactly what would be occurring during these 12 weeks that would effect the various kinds of repairs needed – these factors exponentially exacerbated the painful, torturous aspects of the suspension.

---

[1] On 12 July 2021, Counsel for SM in this case filed a Complaint with the New York City Commission on Human Rights and the U.S. EEOC alleging violations of SM's rights as a person with disabilities protected by the Americans with Disabilities Act and relevant provisions of the New York City Human Rights Law that arose from the basic Company actions that are the subject of this lawsuit. Investigation and possible resolution of these claims by these agencies are pending. Respondents through their counsel submitted an answer and a position statement responding to the Complaint that purported to provide long-sought but equally long-withheld information explaining the Company's actions. After careful analysis, SM and we as his Counsel found the Company's purported explanations to be profoundly illogical, contradictory, and utterly unworthy of credence, and we expressed these views in our own Rebuttal filed with the Commission and EEOC. Accordingly, our position is that the reasons for the Company's actions remain, essentially, a mystery to us.

27. Every aspect of this scenario was and remains maddening, absurd, kafkaesque, offensive, and surreal. It is a perversion of an employer's discretion to manage its employees. By any measure, it is an astonishing, deliberate, high-handed, contemptuous vacuum of transparency in a contemporary American company's dealings with a highly-compensated, demonstrably talented product manager of some of the Company's lucrative products, as out of place in 21st century American work culture as it would have been at home in the 19th, when employers routinely treated their employees like serfs and did so with impunity. But New York City in the early 21st century isn't a remote village in Czarist Russia or pre-unification Italy, or an urban backdrop in a Charles Dickens novel. It exists in a time and place where due process and procedural fairness are concepts revered in common sentiment even if they are not always explicitly mandated outside of Collective Bargaining Agreements in unionized workplaces.

The Kerfuffle About the FMLA Return-to-Work Form

28. On 24 November 2020, two weeks after SM learned that he had been placed on involuntary FMLA leave, he received an email message from Daroeuth Kay of TriStar, the Company's external leave administrator, that was notable for two main reasons. First, the portion of the email that summarized the identifying details of his leave indicated that he had been placed on FMLA leave because of a notice of need for leave that had been communicated in some form to TriStar, apparently by someone associated with and speaking on behalf of Elastic, on or about 19 November 2020. Mr. Kay's email states, "On 11/19/2020, we were informed of your need for leave from work beginning on 11/11/2020. The reason for leave was noted as Employee Health Condition. The request indicated that this would be a Consecutive Leave." See Exhibit C. This statement was curious because SM himself *had never made this "request" to anyone,* let alone in a form or format that was intended to be conveyed to TriStar, which thus raises questions about who actually had made the request to TriStar on SM's behalf, why and when they had done so, and whether such a clearly patently false overreach was even lawful.

29. Second, this message from TriStar transmitted a form (see Exhibit D) that SM would need to have his healthcare provider complete as a condition to his being returned to the workforce. This form is itself notable for two reasons. First, it is facially tailored to the mechanics and goals of the FMLA, with no specific mention of any laws that deal with disabilities. Furthermore, as a result of its overt FMLA focus, it is jarringly inapplicable to SM's circumstances because its entire predicate, arguably its sole purpose, is gathering information for the management of an employee's current absence from work because of, or for their absence in an identifiable period in the future because of their treatments for, one or more medical conditions that prevents them, or will in the future prevent them, from doing their job. And it poses these requests for information from the standpoint of

an employee's request for FMLA leave, not a company's imposition of leave, and is thus inapplicable to SM's situation ab initio.

30. Given the profound disconnect between his demonstrated ability to do his job well in spite of his medical condition, on the one hand, and, on the other hand, the purposes and assumptions of this form, SM of course saw no legitimate reason for submitting the form as a condition for ending a compelled leave that had simply never made any contact with the actual facts that characterized his life, his medical condition, or his work at all. To wit: his condition hadn't prevented him from doing his work, and nor had his treatments for it; working didn't exacerbate his condition or expose his colleagues to contagion; the simple act of not working bore no relationship to the scientific and medical considerations that defined the treatability of his condition (i.e., contrary to Ms. Igoe's suggestion that being on leave would allow him to "focus on his health", the favorable responsiveness of his condition to treatment turned on and was **limited by science,** not on whether he was free from "the added pressure of his job" to be able to "focus" on it, as Ms. Igoe said in her 10 November email); and there was no treatment regime besides his current, highly manageable one that he had made a commitment to receiving at any identifiable specific future period. Note that even the Company's Employee Handbook reflects an understanding that FMLA/medical leave requires that an employee be unable to perform his or her work duties. See id. Sections 4.1(4) and 4.1.9.

31. Nonetheless, as a show of good faith, SM informed the Company in an email on 9 December 2020 that he was not flatly refusing to complete the form, but instead requesting that the Company explain the grounds that made the form applicable to his situation before he completed it. See Exhibit E. Given the Company's own understanding of the importance of inability to work as reflected in the aforementioned sections 4.1(4) and 4.1.9 of its Employee Handbook, this was a perfectly legitimate and reasonable request, and SM actually made this request twice over time. However, the Company steadfastly refused to provide the requested rationale, and instead continued to insist that SM's completion of the form was a mandatory condition for his return to work. Toward the end of his allotted leave, SM elaborated on his reasons for not wishing to complete the form and his reasons for believing that the demand was improper. See Exhibit B. In response to this, Ms. Igoe then dramatically lowered the bar for the return- to-work conditions. Instead of insisting that SM complete the form provided by TriStar, she stated the Company's willingness to return SM to work if he simply had his healthcare providers asseverate that he could return to work subject to any applicable restrictions. See Exhibit B. It cannot be overlooked that this near-total reversal was a tacit acknowledgement that this form had never been necessary. If it had been, the Company would either have explained its rationale for demanding it in terms that the FMLA, which

allegedly authorized it, would deem acceptable, and continued to insist on it despite SM's objections.

32. In mid-January 2021, as the expiration of his allotted FMLA leave approached, SM began to worry that the Company's stunning refusal to answer his 14 questions, and its abrupt and unexplained belated abandonment of the FMLA form requirement that in SM's judgment never should have been imposed, might all be signaling a new erratic or irrational development in the Company's approach to his circumstances that could jeopardize his employment itself. Specifically, he was concerned that if he refused to provide any sort of return-to-work certification, especially one that satisfied the Company's new relaxed requirement, it would give the Company a justification for terminating his employment for abandoning his job if he had failed to do everything within his abilities to allow the Company to reinstate him. The fact that the Company offered to extend his leave by one month beyond the end of his FMLA leave was an encouraging sign that the Company's intentions might not be malevolent, but in practical terms accepting this offer would only extend the time when he would continue to be without income, without necessarily shedding any light on why he had been forced to take FMLA leave to begin with, or enabling him to make any progress on handling his medical condition beyond what he had already been doing since his diagnosis and that his job hadn't interfered with. Reluctantly, out of an abundance of caution and solely because it seemed like the least-worst option available, SM obtained a terse, succinct certification from his primary oncologist stating that he was able to do his work without restrictions, and submitted it directly to Ms. Igoe under protest that he still rejected the premise for any kind of certification and that he intended to continue exploring legal action against the Company. A copy of both the certification and the email transmitting it are attached as Exhibit F.  SM is confident that one or another of his healthcare team members while he was being attended to here in NY CIty would asseverate to the fact that his illness did not prevent him from working, and was not exacerbated by working, during the period relevant to this action.  Company representatives never asked him for such assurances before putting him out on involuntary FMLA leave or at any time before the improper Return-to-Work certification was requested, despite SM's assurances to these effects.

<u>Demotion Upon Reinstatement</u>

33. SM returned to work without fanfare on 3 February 2021. Unfortunately, the duties that he began performing upon his return and that continued until he went out on actual requested FMLA leave early this year were dramatically attenuated compared with what he was doing before he was placed on leave involuntarily in November 2020. Although SM has retained his job and his salary and his benefits generally have not been diminished (with the exception of his bank of FMLA leave time, which was initially

14

improperly exhausted but which has since been replenished)[2], the adverse changes in SM's duties constituted a demotion. Specifically, before being forced to take FMLA leave, SM had been an active member of several teams working on several different products. His roles were both creative and detail-oriented in nature, working with other teams and team members to devise new and better tools for the Company's customers, and he was considered the product lead on several of these projects. By contrast, SM's role since returning to work has been more in the nature of maintenance for one product only and one team. And these changes have all occurred without a word from any Company representative -- neither Ms. Igoe nor either of SM's managers -- explaining what caused these changes in his duties and team memberships to be made, or what their objectives are. Similarly, besides Ms. Igoe checking in with SM a few weeks after his reinstatement to see how his return was going, the Company once again made no effort to understand the then-current status of his condition in consultation with SM's healthcare providers, the implications of his condition in its then-current form for his work duties, or whether there was anything that the Company could do to help SM balance fulfilling his work duties with taking advantage of whatever treatment options that existed for him at the time.

34. On 13 April 2021 SM emailed Ms. Igoe a lengthy message in which he summarized his beliefs that the Company's actions towards him in light of its knowledge of his medical condition had violated his rights under several laws, threatened legal action after a specified deadline would have passed, and proposed several resolutions that would obviate his taking such action. An excerpted copy of this message is attached as Exhibit G and it, of course, speaks for itself.

## **WILLFULNESS FOR STATUTE OF LIMITATIONS PURPOSES**

35. Both the FMLA and FLSA allow for the lengthening of the filing statute of limitations period from two to three years when a defendant has acted either with knowledge that its actions have violated an employee's rights under these acts, or they have demonstrated, or can be charged with, reckless disregard for whether they were in fact committing such violations. See 29 USC 255(a) (FLSA); 29 USC 2617(c) (FMLA) with respect to all of our claims. We believe that this willfulness standard has been met here. What allows us to meet it is the fact that SM repeatedly remonstrated against virtually every aspect and every development of the Company's acts of putting him on FMLA involuntarily, i.e., putting him on this leave for a variety of what he adjudged to be inappropriate and unfounded grounds, keeping him on such leave despite his numerous protests and

---

[2] SM relocated to the Houston, Texas area in late 2021. He remains employed by the Company and considers the Company's office nearest his residence to be his "home base" location. Earlier this year, SM properly and voluntarily took FMLA leave to receive a specific type of treatment for his medical condition at a highly regarded hospital near him. His recovery from the treatment is continuing.

requests that the leave be ended immediately, requiring even a modified certification to prove what had never, ever been in question (his ability to do his work notwithstanding his diagnosed illness), withholding or deducting any part of his compensation, and returning him to an anemic version of his previous duties after his reinstatement following the end of the leave. He began making these protests just a few days after the leave commenced, and he continued making them throughout the leave and even continued to protest various aspects of the leave as late as April 2021, long after the leave had ended. In these protests, SM repeatedly and unequivocally accused the Company of violating his rights by putting him out on leave, by not paying him properly, and other acts that he believed were illegal, and he overtly threatened legal action in at least one of these protests. Nonetheless, the Company's responses were always the same: to keep doing what they were doing, with the exception of easing the certification requirement somewhat (which we discount because the requirement in any form or to any degree was inherently inappropriate and not allowable anyway). Given the frequency and clarity of these protests, we contend that the only way that the Company could have persisted in its actions towards SM would have been at minimum because they were indifferent to whether his allegations were correct, i.e., because they recklessly disregarded whether their actions violated SM's rights under the FMLA, the statute governing medical leaves of absence, and the FLSA, the statute governing the payment of compensation to salaried employees.

36. In any case, we believe that an investigation through the usual discovery processes will be necessary to resolve whether the 3 year extension applies here. Some of the tests that courts have used to determine whether there was sufficient willfulness to support the extension have been whether there was an unusually high risk of harm from an employer's actions that the likelihood of violation was so obvious that the employer should have known it; whether an employer continued a practice without further investigation after being put on notice about possible unlawfulness; and whether discovery would be likely to produce helpful information on the questions of awareness and/or motive. Also, some courts recognize that a determination of willfulness often turns on information that an employee, like SM, cannot be expected to know, e.g, about what an employer knew or didn't know, was aware of or not, or investigated or not, all considerations that are relevant to whether they acted with reckless disregard. All of these considerations seem especially pertinent here with regard to the Company's initial decision to place SM on involuntary FMLA. As an illustrative example only and not by way of limitation, SM believes that the incongruity between the FMLA's benevolent purposes and its use as a performance enhancement tool was so glaring that the Company could not possibly have been unaware that using FMLA in such a manner was not permissible, but he lacks the access to information at this stage that would allow him to know how the Company perceived this possible lack of fit or what steps, if any, it took to

understand or resolve it.  But similar information lacuna attend other events arising under both FLSA and FMLA in this dispute.  Without it, SM has no real basis for concluding what specific people were thinking about the legality of what they were doing vis-a-vis the FLSA and FMLA either in the face of his protests or without them, and we believe that proper discovery will provide answers to these kinds of questions.  Accordingly, we believe that the three year, rather than the two year, statute of limitations should apply to the filing of this Complaint.  We also believe that this filing would nonetheless be timely under the two year limitation.

## INDIVIDUAL LIABILITY UNDER FLSA AND FMLA

37. Both FLSA and FMLA allow for individuals to be liable for violations of their respective provisions, and they do so under the same or very similar circumstances: when an individual has taken actions injurious to an employee covered by either statute when the actions were in furtherance of the actor's employer's interests.  See 29 USC Section 2611(4)(A)(ii)(I) and 29 CFR 825.104(d) [FMLA]; 29 USC Section 203(d) [FLSA].  This analysis entails considerations of an actor's actual or apparent authority with respect to an affected worker's terms and conditions of employment, along with what were the actor's goals and intentions.

38. Based on what we believe that we know at this point, we allege that both Rachelle Igoe and Erika Haraguchi are individually liable for SM being placed and maintained on FMLA leave improperly and involuntarily.  The reason for this is that according to Ms. Igoe, the decision to place SM on this leave was made by the two of these employees and without either of them including any other employee or employees as responsible for or even participating in this decision.  Also, Ms. Igoe was clearly the person who was deflecting SM's criticisms and requests about the leave and the salary issues, although it is not known at this point whether she was the formulator as well as the messenger of the decisions.  We expect discovery to reveal whether there could be other bases for liability under either of these statutes against Ms. Igoe or Mr. Haraguchi.  We have denominated Doe Defendants 1 - X in the event that more people in the Company can be inculpated for, e.g., violations of SM's FLSA rights, responsibility for or participation in SM's demotion upon reinstatement or other aspects of the FMLA violations, or for other events or incidents.

# CLAIMS

## *FMLA Claims*

39. Claim Number 1: Improper Imposition of FMLA Leave Based on Poor Job Performance

The Company repeatedly invoked SM's perceived work-performance problems as a reason for putting SM on FMLA leave involuntarily, beginning 11 November 2020, and it explicitly told SM that his imposed absence from work pursuant to FMLA leave would enable, indeed would be necessary for, the "damage" he had done at work to be ameliorated so as not to further impair his own "reputation."  Furthermore, the Company continued after the commencement of the FMLA leave to re-articulate such non-medical, work-related reasons as grounds for both having imposed the involuntary leave to begin with and continuing it despite SM's numerous requests that it end.  But there is no statement anywhere in the FMLA itself or in any of its implementing Regulations allowing the FMLA to be used by an employer for the purpose of either disciplining an employee for perceived poor performance, or for incentivizing an employee to improve their performance, especially when, as in this instance, there is no evidence whatsoever by any measure that SM was unable to perform his work because of either his cancer or his treatment regime for it.  This misbegotten use of FMLA for performance enhancement purposes is a per se violation of the reasons FMLA was enacted, and thus violates the foundational purposes of the Act set forth at 29 USC 2601(b); 29 CFR 825.101.  Plaintiff respectfully asserts that both the complete silence of FMLA on its availability for use for such work-related purposes, and the requirement that leaves involve an employee's inability to do their job because of their health condition, constitute rights provided by the Act to be free of such uses and impositions.  Plaintiff thus respectfully asks this Court to take these benefits into account to distinguish this case from any decisions finding that involuntarily imposed FMLA leave violates no rights provided by the Act.

40. Claim Number 2: Bad Faith Imposition of Involuntary FMLA Leave

Plaintiff notes that both FMLA itself and its implementing Regulations encourage employers to act in good faith in several specific instances, see, e.g., 29 CFR 825.307(c) (when requiring a third medical opinion for return to work certifications); 29 CFR 825.218, 219(b) (when determining that returning a key employee to their previous position would entail unacceptable economic injury to the company); see also 29 CFR 825.400(c)(employer can avoid liquidated damages if violation of FMLA was done in "good faith").  Plaintiff respectfully asserts that good faith conduct by an employer is not restricted by FMLA to just specific, enumerated instances but is a general requirement of

the Act placed on both employers and employees, and that when an employer, such as Defendant Elastic NV here, not only uses FMLA for unintended and unauthorized performance-related purposes, but also completely ignores the requirement of an employee's inability to perform their job by imposing leave on an employee, SM, who had never been unable to perform his job because of his health condition, by definition such an employer has acted in bad faith and should be required to answer for such misconduct on the ground that they have violated the spirit, the intentions and purposes, of the FMLA.  Undergirding this claim is that 29 USC Section 2601(b)'s requirement that an employee's "inability to perform" is a prerequisite to entitlement to leave, constitutes an employee's right to be free of imposed FMLA leave when he or she is performing their job without impairment by their health.  See 29 CFR 825.123(a)(by articulating that an employee must be unable to work "at all", the Regulation draws a clear distinction between such circumstances and those in which an employee's work might be perceived as being less than perfect or not up to that of other workers or their own previous work).  Thus, Plaintiff respectfully again asks that this protection for an employee from involuntary suspension when their health is not preventing them from performing their work "at all" constitutes a right that the FMLA provides that is violated when FMLA is, as here, imposed involuntarily on an employee, as SM, for whom there never was any evidence whatsoever that his health condition was preventing him from doing his job "at all."

41. Understanding the "ability to work" requirement is crucial for this claim.  This is the explicit requirement of the FMLA itself, which in title 29 section 2612(a)(1)(D) of the U.S. Code overtly specifies that the condition makes the employee "unable to perform." The sections of the FMLA Regulations that elaborate upon this requirement, apparently chapter 29, sections 825.112 - 825.115, and 825.123 of the Code of Federal Regulations (there might be more parts but these are apparently the main ones) clarify what this phrase means in a variety of contexts involving an employee's health.  Although sprinkled throughout these sections different phrases are used to describe it (e.g., "incapacitation"; inability to "perform the functions" of one's job; inability "to work" or to "work at all"), the single concept that underlies and unifies these factors is clearly, consistent with the sparse language of the Act itself, the straightforward proposition that because of a health condition or treatments for it an employee is simply unable to do his or her job.  While some subsections of these passages require that the qualifying inability to work lasts for three consecutive days or more, one or more subsections seem to allow for a shorter qualifying period, taken in the overall context of the Act's intentions and the balance it strives to reach between employers and employees, even these subsections require "absences attributable to an incapacity", where "incapacity" means "inability to work."  FInally, there is zero support in the FMLA or its Regulations supporting the idea that "inability to work" should be regarded or applied as synonymous with the quality of

an employee's work, versus whether the employee could do the work "at all" or not. One problem, among many, of the Company's use of involuntary FMLA leave against SM here was that at least part of the reason the Company did so was in response to perceived problems that allegedly occurred as a result of SM doing his job, not because he wasn't doing his job at all. Such an implementation of involuntary leave impermissibly conflates objective inability to work with subjectively perceived unsatisfactory work in a way that no part of the Act or its Regulations authorizes or sanctions. Yet, that seems apparently to be what occurred here. Which is in part why we deem the unwanted imposition of the leave on SM unlawful.

Claim Number 3: Improper Deductions From SM's Salary

42. 29 CFR 825.206(c) of FMLA effectively embellishes Regulation 29 CFR 541.602(b)(7) that implements FLSA by elaborating on the circumstances under which an employer may withhold completely or may dock the compensation of a salaried, exempt employee, like SM. FLSA Regulation 29 CFR 541.602(b)(7) holds that an employer CAN withhold or dock even a salaried, exempt employee's compensation when such an employee is out on FMLA leave. By contrast, the mirror image FMLA Regulation 29 CFR 825.206(c), specifically invoking 29 CFR 541.602(b)(7), sets forth the circumstances under which such docking or withholding may NOT occur, and it expressly provides that the exemption provided by the relevant FLSA Regulation DOES NOT APPLY if the employee does not qualify for FMLA leave because, and this is again an explicit reference, they do not have a qualifying serious health condition: "Nor may deductions which are not permitted by 29 CFR part 541 or 29 CFR 778.114 be taken from such an employee's salary for any leave which does not qualify as FMLA leave, for example, deductions from an employee's pay for leave required under State law or under an employer's policy or practice for a reason which does not qualify as FMLA leave, e.g., leave …*for a medical condition which does not qualify as a serious health condition….*(emphasis supplied." Thus our Claim Number 3 is that the Defendant Company violated this restriction by paying SM less than his full salary for the pay issued to him on 15 December 2020, 15 January 2021, 29 January 2021, and 12 February 2021, and on any other dates besides these that occurred during or as a result of his leave. The reason for this is that SM was never properly on FMLA to begin with, for all of the reasons cited in the Claims above, to wit: his medical condition was not a "serious health condition" within the meaning of FMLA because it never prevented him from doing his job "at all", regardless whether some at the Company might have believed that he wasn't doing his job "better"; and the Company improperly used FMLA leave to suspend SM for performance-related purposes. As a result, under FMLA Regulation 825.206(c), no withholding or docking of his regularly disbursed salary payments was proper during any

part of his imposed FMLA leave, and the deductions from these payments on the specific dates above thus violated this Regulation's prohibitions.

43. We believe that FMLA Regulation 825.206(c) establishes a stand-alone, actionable, redressable violation of FMLA that supports appropriate damages relief, because even though it elaborates upon the similarly worded parallel FLSA, it specifically sets forth protections against improper salary withholding and deductions for employees in itemized, enumerated circumstances that are tied directly to FMLA itself (e.g., no exemption will permit salary deductions and withholding when the employee has not qualified for FMLA leave under the terms of FMLA itself; such distinctions are lacking in the parallel FLSA Regulation). We also believe the same is true for the parallel FLSA Regulation, 29 CFR 541.602(b)(7), that is the focus of Claim 7 below, meaning that it, too, prescribes discrete enforceable rights, albeit to **employers,** rather than t o employees as in the FMLA Regulation. But if the FMLA Regulation is deemed to merely recapitulate or be derivative of the rights created by FLSA such that it is not considered to establish any rights arising from FMLA, nonetheless both it and the parallel FLSA Regulation will squarely require a determination of the crucial question whether the Company properly placed and kept SM on involuntary FMLA leave, and whether it properly reinstated him after that leave ended, even if the Court holds that this question cannot itself support the finding of liability for the Company or any of the individual Defendants under FMLA.

Claim Number 4: Improper Requirement of a Return-to-Work Certification

44. The Company's demand that SM submit a completed Return-to-Work Certification form as a condition to his reinstatement was improper at this or at any time, because SM never had a qualifying "serious health condition" within the meaning of the Act. See 29 CFR 825.305(a). Moreover, an employer may request a certification at some later point after the commencement of FMLA leave "if the employer later has reason to question the appropriateness of the leave or its duration." 29 CFR 825.305(b). We maintain that the predicate for the return to work certification was not met here because SM was never properly out on FMLA leave to begin with, and thus that the requirement in any form that he had to prove that he could simply do his job, when his illness had not ever prevented him from doing his job, was per se an unlawful demand. The practical effect of this improperly imposed requirement was that when SM legitimately refused initially to provide a completed form, the Company used his refusal as grounds for extending his unauthorized and improper leave.

Claim Number 5: Improper Imposition of Full-Time FMLA Leave

45. 29 CFR 825.311(c) prohibits an employer from requiring an inappropriate length of leave ("It may be necessary for an employee to take more leave than originally anticipated. Conversely, an employee may discover after beginning leave that the circumstances have changed and the amount of leave originally anticipated is no longer necessary. *An employee may not be required to take more FMLA leave than necessary to resolve the circumstance that precipitated the need for leave (*emphasis supplied).*"*)  As we have stated ad infinitum in this Complaint, our position is that SM should never have been required to take FMLA for any length of time by the Company.  However, it is at least possible that SM might have been chargeable with "intermittent leave" for the several hours every few weeks when he was having tests run by his healthcare team, although we do not necessarily concede that he could have been forced to do even that especially on those occasions, which were frequent, when he was getting his Company work done notwithstanding that he was being monitored at his doctors' offices.  But the Company never at any point ever offered SM this option and never gave any indication to him that it was even considering what would definitely have been this much less intrusive and disruptive form of leave – and we reiterate our position that no kind of FMLA of any length should have been imposed on him.  Accordingly, we charge that the Company's imposition of full-time FMLA leave instead of a lesser duration and impactful intermittent leave tailored to his actual treatment times, if even then, violated Section 825.311(c) of the Regulations.

Claim Number 6: Improper Demotion Upon Reinstatement

46. The creative and leadership roles, responsibilities, and opportunities for growth that SM was given upon his return to work after the completion of the FMLA leave were markedly not just different from, but inferior to, the work he had been doing before the leave began, in the ways articulated in the FACTS section above.  We believe and charge that this composite adverse change violated 29 CFR 825.214 and 824.215(e) (requiring return to an "equivalent position", which is one that has "substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position.").  Moreover, if discovery reveals that SM met the requirements to have been considered a "key employee", then it would be clear that the Company's returning him to the severely diminished role that he was placed in upon his reinstatement after FMLA leave did not satisfy any of the determination and notice requirements set forth in the Regulations applicable to such changes.  See 29 CFR 825.216(b); 825.217(a)-(c); and 825.218.

*FLSA Claims*

Claim 7: Improper Docking of Exempt Salary Payments Under FLSA

46. As adumbrated above in connection with FMLA Claim Number 3, the docking of SM's payment on the four dates identified in Claim Number 3 also constituted violations of FLSA Regulation 29 CFR 541.602(b)(7). This was because the invalidity of SM's involuntary FMLA leave prevented the Company from not honoring SM's status as a salaried, exempt employee by paying any amount less than SM's full salary for any period during, caused by, or related to the leave. As with the complementary FMLA Regulation in Claim Number 3, resolving allegations grounded in this FLSA Regulation will necessarily require resolving whether the imposed involuntary FMLA was proper.

Claim 8: Retaliation Under Both FMLA and FLSA

47. Both FMLA and FLSA prohibit retaliation for the assertion of rights arising under each of these statutes, and they include internally opposing perceived violations. See 29 USC 15(a)(3) (FLSA), and 29 USC 2615(a)(1), (2) and 29 CFR 825.220(a)(1), (2) (FMLA). We invoke the now-standard definition accepted by the U.S. Supreme Court in Burlington v White 548 US 53 (2006) which holds that actionable retaliation occurs when an employer takes actions that would dissuade a reasonable worker from asserting or supporting claims of unlawful conduct. The history of SM's interactions with the Company beginning a mere few days after he learned of his impending suspension on 10 November copiously documents and establishes SM's remonstrations of every aspect of the many forms of perceived mistreatment that are the subject of this lawsuit. SM was relentless, focused, detailed, articulate, and passionate in his criticisms of the Company's actions of putting him out on involuntary FMLA leave for dubious and improper reasons, keeping him on it despite no evidence whatsoever that his illness had ever prevented him for doing his work, the Company's intention to dock his pay and offering him NY State disability as an alternative option for income which engendered fears that he would be prosecuted for perjury if he applied for it because he wasn't unable to work, threatening to take legal action against the Company, and of course accusing the Company throughout that all of these actions were at least inappropriate if not in some instances flatly illegal. In short, SM was a thorn in the Company's groin. We believe that one, several, or all four of the unauthorized pay deductions, and/or the demotion in his duties upon his reinstatement following the end of his FMLA leave, were the ways that the Company expressed their disapproval of SM's complaints and threats, and that these acts of reprisal were unlawful because awareness of them would dissuade a reasonable worker from making similar protests.

## RELIEF REQUESTED

48. SM requests that the Court authorize full discovery under the FRCivP, and, for every violation of the Act that the Court or a jury finds, that the Court exercise its remedial authority under the FLSA and FMLA to require any or all of the Defendants to perform the following actions to make SM whole:

a. Payment of every dollar of salary, net of applicable standard deductions, that SM would have received had he not been improperly put out on leave for 12 weeks, subject to proof of the actual amount involved (as previously noted, SM acknowledges that the Company paid him his salary during the first few weeks of the leave), together with all interest on such sum as allowed by New York and/or U.S. law.

b. Fully returning SM to his pre-leave duties based on his oncologist's already submitted medical certification allowing him to work without restrictions, or to formulate and provide him and this Court with a detailed explanation for why this is not possible that turns on considerations that are lawful under the FMLA.

c. Payment of a sum not less than $1 (one) million tax-advantaged dollars to compensate SM for the emotional pain and suffering, characterized by, among other emotional or psychological states, persistent anxiety, constant anger and outrage, agonizing depression, fear, and bewilderment, that the Defendants needlessly inflicted on SM in connection with any act or failure to act by any Defendant for which such damages are awardable, e.g., my FLSA retaliation claims pursuant to 29 USC Sections 216(b) and 15(a) for what SM has experienced, including elevated blood pressure, migraines, acid reflux, constant bouts of diarrhea, extreme nausea -- often vomiting in the shower in the morning -- sleep deprivation, constant tears (crying) of frustration and sorrow, a loss of faith in his team and company to do the right thing ever, an inability to focus outside of work, and an almost total loss of meaning to life and loved ones. These are not responses to the normal pressures and heartaches of daily contemporary life, they are responses to the extreme psychological and emotional abuse that one or more of the Defendants have inflicted on SM by their actions over nearly two years now. As documented above, these acts included willful, prolonged, contumacious failures to take the proper steps under the law to remedy; suspending him from his job and truncating his work duties without even the most skeletal simulacrum of due process despite the fact that the suspension was clearly performance-related, and the possibility that the change in his duties was also performance-related and again, like the suspension, rested on undisclosed and possibly inaccurate misperceptions about his "decisions", work, or activities; persistently substituting from the beginning misdirection, gaslighting, and patronizing stonewalling in

the place of simple, complete, and direct information that would give SM specific information about why all of this was being done to him; egregious and completely unnecessary tardiness in revoking the facially inapplicable FMLA return to work form requirement that never should have been interposed to begin with; docking his pay as retaliation; and the possibility that changes in his work duties were performance-related and/or retaliatory in some way, making them yet another example of a misuse of FMLA. As SM implied in one of his emails to Ms. Igoe, no one should be subjected to emotional whiplash like this on their job -- especially while dealing with a blood cancer that threatens SM's life but that (again it must be said) never stopped him from doing his job.

d.  Reimbursement to SM for all of his attorneys fees incurred as a result of the Defendants' actions, including fees incurred to obtain legal counsel prior to the filing of this Complaint, fees incurred for the research, drafting, and filing of this Complaint, and any fees incurred for SM's prosecution of this action up to its conclusion, in an amount to be provided, and together with all interest allowed by New York law.

e.  Performance of such other acts as in the Court's judgment are necessary to compensate SM and make him whole for any Defendant's violation of any provisions of the FLSA or FMLA.

Respectfully submitted this 9 November 2022.

                                                    s/ Jerome K. Mitchell

                                                    _____

                                                    Jerome K. Mitchell
                                                    Mitchell Law Group, P.C.
                                                    295 Madison Avenue,
                                                    12th Floor
                                                    New York, NY 10017
                                                    (O):(646) 893-6049
                                                    (F):(646) 933-8099
                                                    (E):j.mitchell@mitlawgrp.com
                                                    Counsel for Plaintiff